UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
──────────────────────────────────────────X

EVELYN BENSON,

        Plaintiff,

-against-                                **MEMORANDUM & ORDER**
                                                              **02-CV-4756 (NGG)(RML)**

NEW YORK CITY BOARD OF EDUCATION,

        Defendant.
──────────────────────────────────────────X

GARAUFIS, United States District Judge:

        Evelyn Benson ("Benson" or "Plaintiff") alleges that her former employer, the New York City Board of Education (the "Board" or "Defendant"), violated federal and state law by retaliating against her in response to a lawsuit she filed against the Board in 1999.[1] The Board has moved for summary judgment pursuant to Fed. R. Civ. P. 56, arguing that Benson's claims are partially barred by the doctrine of res judicata, are partially or entirely time-barred, and do not satisfy the "adverse action" and causation elements of unlawful retaliation. For the reasons set forth below, this court grants the Board's motion, dismisses Benson's federal claims with prejudice, and dismisses her state claims without prejudice to her refiling them in state court.

**I.    Factual Background**

        Before setting forth the relevant facts, I note that when deciding a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory

---

    [1]    I will refer to that case, Benson v. New York City Board of Education, No. 99-CV-6634 (NGG) (E.D.N.Y.), as "Benson I."

answers, and depositions in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995). Even in a fact-intensive employment discrimination case, however, the court will not accept as fact mere allegations lacking evidentiary support. Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001).

Benson began working for the Board in 1971. Benson I, slip. op. at 1 (September 30, 2003) (cited hereinafter as "S.J. Order, Benson I at __"). In 1993, after a series of promotions, she was assigned to work for District 75 as an Automate the Schools ("ATS") coordinator with the title Provisional Computer Associate. (Id.) In 1997, the Board denied her request for a raise. (Id. at 1-2.) Later that year, Benson complained to the Board about the denied raise and about remarks allegedly made by her then-supervisor, who Benson claimed disparaged her on the basis of her race (African-American) and religion (Jehovah's Witness). (Id. at 2.)

On June 23, 1998, after filing two administrative grievances with the Board, Benson filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") alleging that the Board discriminated against her on the basis of her race and religion by failing to give her a pay raise and creating a hostile work environment. (Id. at 2-3.) On October 18, 1999, Plaintiff filed a complaint in federal court alleging the same. (Compl., Benson I.) Per the order of Magistrate Judge Levy, Benson was permitted to assert a claim of continuing retaliation in Benson I based on conduct that occurred on or prior to August 30, 2000 (the "Cutoff Date"). (Cmplt. ¶ 11; Benson Aff. ¶ 4.) This court dismissed Benson I under Fed. Rule Civ. P. 56 on September 30, 2003 (S.J. Order, Benson I.) and the Second Circuit affirmed, Benson v. New York City Bd. of Educ., 161 Fed. Appx. 83, 2005 WL 3556190 (2d Cir. 2005).

On February 12, 2002, while Benson I was pending, Benson filed a second charge with the EEOC alleging, *inter alia*, that the Board retaliated against her for filing the 1998 EEOC charge and Benson I. (Richardson Decl. Ex. D at 1-3.) On August 28, 2002, again while Benson I was pending, Benson filed the present case, in which she alleges retaliation based on "racial profiling," two job transfers, the denial of her health benefits, the Board's failure to promote her, and her constructive termination.

### A.  Racial Profiling

At her deposition, Benson testified that the Board retaliated against her when it alleged that she hit her former supervisor Lawrence Gardener ("Gardener"). (Richardson Decl. Ex. G at 34-35, 42-43.) Benson considers this allegation to be an instance of "racial profiling" because she believes she was deemed violent based on her race rather than her individual personality. (Id. at 32-33, 34-36.)

### B.  Denial of Health Benefits

The Board suspended Benson for the month of August 2000. (Id. ¶ 7.) When Benson returned from that suspension, the Board failed to reinstate her health benefits for nearly one year. (Id. ¶ 8.)

### C.  The HHVI Transfer

On or about October 2, 2000, the Board, acting via Susan Erber ("Erber"), the Superintendent of District 75, transferred Benson to the Office of Hard of Hearing and Visually Impaired ("HHVI") under the supervision of Ina Hymes ("Hymes"). (Pl.'s 56.1 St. ¶ 9.) While at HHVI, Benson was assigned a clerical position, was given a small desk without a phone or computer, was initially not given any specific assignment, was then given "menial clerical

duties" not befitting her title and performed under the supervision of someone whom Benson would normally supervise, and was required by Hymes to sign in and out for lunch. (Id. ¶¶ 10-11, 14-16; Pl.'s 10/16/00 Ltr. to Ina Hymes (Campos-Marquetti Decl. Ex. D).)

### D. The OSS Transfer

On July 31, 2001, Erber again transferred Benson, this time to the Office of Speech Services ("OSS") under the supervision of Helen Kaufman ("Kaufman"). (Pl.'s 56.1 St. ¶ 18.) While at OSS, Benson was assigned a "half desk," was given the task of packaging, and was the only employee required to sign a log sheet in Kaufman's office at the beginning and end of each day. (Id. ¶¶ 19-21.)

### E. Non-Promotion to Educational Analyst

Benson was not promoted to the position of Educational Analyst despite scoring a 100 on the exam for that position. (Id. ¶¶ 23, 30.) Benson was interviewed for that position by Thomas Seluga ("Seluga"), who during the interview questioned Benson about her alleged assault of her former supervisor Lawrence Gardener ("Gardener"). (Id. ¶¶ 27-28.)

### F. Constructive Termination

Benson alleges that she "was constructively terminated and became disabled from her employment at [the Board] because of the emotional distress she was suffering from the retaliatory conduct of [the Board]" on September 10, 2002. (Pl.'s 56.1 St. ¶ 31.)

## II. Legal Analysis

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party," Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "A fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz, 258 F.3d at 69 (citations and quotation marks omitted).

The moving party bears the burden of establishing the absence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). If the moving party has met this burden, then the non-moving party has the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118,121 (2d Cir. 1990) (internal quotations and citations omitted); see also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmovant can create a genuine issue of material fact only by citing competent, admissible evidence. Glasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004) (citing Sarno v. Douglas Elliman-Gibbons & Ives, 183 F.3d 155, 160 (2d Cir. 1999)).

In moving for summary judgment, the Board first argues that Benson's claims are barred by the doctrine of res judicata to the extent that they were addressed in Benson I. The Board next argues that Benson's remaining claims are partially time-barred. Finally, the Board argues that whatever claims are not time-barred or barred by res judicata should be dismissed on the merits. I address each of those arguments in turn.

A.      Res Judicata

The Board argues that Benson's claims are barred by the doctrine of res judicata to the extent that they arose on or prior to the Cutoff Date imposed in Benson I. Under the doctrine of res judicata, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Legnani v. Alitalia Linee Aeree Italiane, S.p.A., 400 F.3d 139, 141 (2d Cir. 2005) (citations and quotation marks omitted).

Res judicata generally does not bar claims arising after the prior litigation was filed. Id. (res judicata did not bar an employee from claiming retaliation based on facts that arose after she filed a discrimination suit). To the extent that Benson's retaliation claim arose after the Cutoff Date – ten months after she initiated Benson I – the claim is not barred by res judicata.

The Board identifies one claim that arose before the Cutoff Date: the claim that Benson was retaliated against when she was charged with assaulting her prior supervisor Lawrence Gardener ("Gardener"). That claim has already been litigated. See S.J. Order, Benson I at 3, 12-13; see also Benson v. New York City Bd. of Educ., 161 Fed. Appx. 83, 2005 WL 3556190 (2d Cir.). Benson is therefore barred by the doctrine of res judicata from relitigating that claim.

B.      Timeliness

The Board next argues that Benson's claims are barred to the extent that Benson has failed to comply with the requirement that she sue within 300 days of filing a charge with the EEOC. When an employee brings a suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), "the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency. . . . In addition, the claimant

6

must make the EEOC filing within 300 days of the alleged discriminatory conduct[.]" Williams v. New York City Housing Authority, 458 F.3d 67, 69 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-5).

The Board argues that Benson, who filed an EEOC charge on February 12, 2002, may not assert claims that arose more than 300 days earlier, i.e., before April 18, 2001. According to the Board, Benson is therefore precluded from claiming retaliation based on (1) the Board's response to Benson's alleged assault of Gardener, including questioning about the assault during a job interview for the Educational Analyst position,[2] (2) the denial of health benefits, (3) the HHPV transfer, and (4) conditions at HHPV. (Def.'s Moving Mem. L. 8-9.) Benson responds by arguing that all instances of alleged retaliation constitute a single "continuing violation," which is actionable in its entirety even if some of its component incidents occurred more than 300 days before Benson filed her EEOC charge. (Pl.'s Mem. L. 12-13.)

"[T]he continuing violation doctrine 'is heavily disfavored in the Second Circuit' and courts have been 'loath' to apply it absent a showing of 'compelling circumstances.'" Trinidad v. N.Y. City Dep't of Corr., 423 F.Supp.2d 151, 165 n.11 (S.D.N.Y. 2006) (collecting cases). The doctrine provides that if "there is evidence of an ongoing discriminatory policy or practice, such as use of discriminatory seniority lists or employment tests . . . the existence of such a

---

[2] Benson admitted that this questioning occurred more than 300 days before she filed her EEOC charge. (Benson Dep. Tr. at 49.) Benson now argues, contrary to her admission, that the questioning occurred within the 300-day period. (Pl.' 56.1 St. ¶ 27.) The only evidence she cites, however, is Seluga's testimony that the questioning occurred "in 2001" (id. (citing Seluga Dep. Tr. at 12)), which does not support an inference that the interview occurred on or after April 18 of that year. In light of Benson's admission that the questioning took place before that date and the lack of evidence to the contrary, this court finds that no reasonable juror could conclude that the questioning occurred on or after the Cutoff Date.

7

continuing discriminatory practice or policy may delay the commencement of the statute of limitations period until the last discriminatory act in furtherance of it[.]" Harris v. City of New York, 186 F.3d 243, 248 (2d Cir. 1999) (citations and quotation marks omitted). "[A] continuing violation is composed of a series of separate acts that collectively constitute one unlawful employment practice." Washington v. County of Rockland, 373 F.3d 310, 318 (2d Cir. 2004) (citation and quotation marks omitted).

This court finds that the facts in the record do not suggest an "ongoing discriminatory policy or practice, such as use of discriminatory seniority lists or employment tests," Harris at 248, and that they instead constitute a series of independently actionable violations. Although the line between a single, continuing violation and a series of discrete acts is not well defined, it is clear that Benson's allegations amount to the latter. In the leading Supreme Court case on continuing violations, the Court held as follows:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. . . . Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." [Plaintiff] can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-14 (2002).[3] The examples listed by the Court make clear that Benson's allegations (which include two transfers and one failure to promote) are independently actionable events, not aspects of a single, continuing practice.

The only example Morgan provided of a single practice comprised of a series of separate

---

[3] The Court noted, however, that time-barred acts my be introduced "as background evidence in support of a timely claim." Id. at 113.

8

acts is a hostile work environment, id. at 117, which is "based on the cumulative effect of individual acts," id. at 115. Although Benson alleges a hostile work environment in her brief opposing the Board's motion for summary judgment (Pl.'s Mem. L. at 10-12), her Complaint does not allege a hostile work environment and the wrongs she alleges are simply not wrongs of harassment. Faragher v. City of Boca Raton, 524 U.S. 775, 786-87 (1998) (noting in the course of holding hostile environment claims actionable under Title VII that the Court "drew upon earlier cases recognizing liability for *discriminatory harassment* based on race and national origin") (emphasis added). They do not constitute a hostile work environment.

I am therefore compelled to rule that Benson's retaliation claims are time-barred to the extent that they arose before April 18, 2001. The effect of this ruling is that Benson may not claim retaliation based on (1) the Board's response to her alleged assault of Gardener, including questioning about the assault during a job interview for the position of Educational Analyst, (2) the Board's denial of her health benefits, (3) the October 2, 2000 HHPV transfer, and (4) conditions at HHPV. She may, however, introduce these facts "as background evidence in support of a timely claim." Morgan, 536 U.S. at 113 (2002).

### C. Retaliation

The Board argues that to the extent that Benson's claims survive the application of res judicata and are not time-barred, they do not state a claim of retaliation. (Defs.' Moving Mem. L at 9-15.) Title VII forbids an employer from discriminating against an employee because he or she "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a). A retaliation claim is evaluated under the burden-shifting framework established by the Supreme Court in

9

McDonnell Douglas v. Green, 411 U.S. 792 (1973). See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 (2d Cir. 1998). "In the context of a motion for summary judgment, the plaintiff must first demonstrate a prima facie case of retaliation, after which the defendant has the burden of pointing to evidence that there was a legitimate, nonretaliatory reason for the complained of action. If the defendant meets its burden, the plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Richardson v. New York State Dept. of Correctional Service, 180 F.3d 426, 443 (2d Cir. 1999) (citing Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998)).

In order to present a prima facie case of retaliation under Title VII, an employee must cite evidence sufficient to permit a rational trier of fact to find that "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 608 (2d Cir. 2006); see also Kessler v. Westchester County Dept. of Social Services, __ F.3d __, 2006 WL 2424705, *6 (2d Cir. 2006).

The Board concedes that Benson has satisfied the first two elements because it recognizes that (1) Benson engaged in protected activity in filing Benson I and the 2002 EEOC charge and (2) the Board was it was aware of this activity. (Def.'s Moving Mem. L. at 10.) The Board argues, however, that it did not take any "adverse action" against Benson and that what action it did take was not causally connected to Benson's protected activity. (Id. at 10-15.) The Board argues alternatively that if Benson has stated a prima facie case, she has failed to demonstrate

that the Board's proffered legitimate reasons for its actions are mere pretexts for impermissible retaliation. (Id.)

The Supreme Court recently held that the "adverse action" element of a Title VII retaliation claim requires a plaintiff to show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, __ U.S. __, 126 S. Ct. 2405, 2415 (2006) (citation and quotation marks omitted). The Court further held that the employer's actions need not affect the employee's terms and conditions of employment in order to constitute unlawful retaliation. Id. at 2411-14; see also Zelnik v. Fashion Institute of Technology, __ F.3d __, 2006 WL 2623923, at *10 (2d Cir. 2006). In other words, unlawful retaliation can be found even where the adverse action "had not effected any change in [the employee's] salary, benefits, job title, grade, or hours of work[.]" Kessler, 2006 WL 2424705, at *1.

Having considered the Board's res judicata and timeliness arguments, three allegedly retaliatory acts remain at issue. I address each in turn.

1. **The OSS Transfer**

Benson claims that her transfer to OSS was an adverse action because Benson "was assigned to a half desk[,] was given the task of packaging," and was the only employee required to sign a log sheet in Kaufman's office at the beginning and end of each day. (Pl.'s 56.1 St. ¶¶ 18-21.) The Board's response is that Benson has not submitted evidence regarding the difference between her duties and responsibilities as they were prior to and after her transfer. (Defs.' Reply Mem. L. at 8.)

11

The Board's response is inadequate in light of the Supreme Court's <u>Burlington Northern</u> decision. "To be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." <u>Burlington Northern</u>, 126 S.Ct. at 2416-17 (citation and quotation marks omitted). This court finds that a reasonable person in Benson's position could consider the reassignment to OSS materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Id.</u> at 2415. That Benson's job duties at OOS may have been comparable to her duties at HHVI would not preclude such a finding.

The Board also argues that Benson cannot show a causal connection between her protected activity and the OSS transfer because twenty months elapsed between the filing of <u>Benson I</u> and the transfer. (Def.'s Mem. L. at 12-13.) This reasoning is not necessarily correct, however, because Benson is permitted to introduce evidence of the time-barred actions "as background evidence in support of a timely claim." <u>Morgan</u>, 536 U.S. at 113 (2002). It is possible that a reasonable juror who is aware of the time-barred actions – which include an earlier transfer and other allegedly retaliatory acts – would find that the OSS transfer was a retaliatory adverse action even though it occurred twenty months after <u>Benson I</u> was filed. I therefore find that Benson has stated a prima facie claim of retaliation based on the OSS transfer.

The burden therefore shifts to the Board to assert legitimate, non-retaliatory reasons for the OSS transfer. The Board has done so, claiming that Benson, while serving in HHVI (the position from which she was transferred), "was insubordinate to her supervisor, Ms. Hymes,

refused to do assignments given to her, [and] verbally abused her co-workers on several occasions[.]" (Def.'s Mem. L. at 13.) Those allegations are supported by a thorough set of contemporaneous documents, including:

- Two letter from Hymes to Benson stating that Benson refused to discuss an assignment Hymes attempted to give her (Richardson Decl. Exs. H, I);

- A letter from Hymes to Benson stating that Benson spoke to two HHVI staff members in an "explosive" and "insulting" tone (id. Ex. J);

- A memorandum from Marie Tesoriero ("Tesoriero"), a co-worker of Benson, to Hymes stating that Benson "verbally assaulted and terrorized" Tesoriero by screaming, "You people have to stop doing this to me!" and pounding a cup on Tesoriero's desk after Tesoriero asked Benson to contact a parent representative (id. Ex. K);

- A letter from Hymes to Benson stating the same and explaining that Tesoriero's account was confirmed by two witnesses (id. Ex. L); and

- An Incident Report prepared by Tesoriero describing her run-in with Benson (id. Ex. M).

Benson was transferred to OSS approximately one month after the incident involving Tesoriero. (Erber Ltr. to Benson Dated July 31, 2001 (Richardson Decl. Ex. N).) This court finds that the reasons asserted by the Board are legitimate and nonretaliatory.

The Board has therefore carried its burden, which means that Benson must put forth "sufficient potential proof for a reasonable jury to find the proffered legitimate reason[s] merely [] pretext[s] for impermissible retaliation." Richardson, 180 F.3d at 443. Benson has not done so. Nowhere in her brief opposing summary judgment does she allege that the legitimate, nonretaliatory reasons asserted by the Board are pretextual. Instead, Benson states that on

13

"October 16, 2000, [she] was never belligerent to Ms. Hymes" and that she "neither acted explosive or in an insulting manner" to the members of the HHVI administrative staff. (Benson Aff. ¶¶ 9, 13.) Assuming *arguendo* that Benson is telling the truth and that Hymes lied about these incidents, Benson has not stated or suggested that Tesoriero and two other witness lied when they described what took place between Benson and Tesoriero, nor has she explained why any of those three people would wish to retaliate against her for having filed Benson I. In addition, the Benson-Tesoriero incident preceded the OSS transfer by only one month, lending credibility to the Board's assertion that the transfer was motivated by this and the other cited incidents rather than by a desire to retaliate for Benson I, which was filed nearly two years earlier. This court therefore grants the Board's motion as to this claim.

### 2. Non-Promotion to Educational Analyst

Benson claims that the Board retaliated against her by "denying [her] a promotional appointment" to the position of Educational Analyst. (Pl.'s Mem. L. at 11.) She argues that this non-promotion was an adverse action because "there were candidates that were appointed with lower rating scores" than Benson's score of 100. (Id. at 19.) She also argues that the non-promotion was causally connected to her filing of Benson I because when she was interviewed for the position, the interviewer asked her if she had assaulted Gardener.[4] (Id. at 21.)

The Board disputes that candidates with lower scores were appointed to the position (Defs.' Reply Mem. L. at 9), and the only document relied on by Benson supports the Board's position. That letter, sent to Benson by Stephen Dobrowsky ("Dobrowsky"), Director of the

---

    [4] As explained above in Part II.A of this Memorandum and Order, Benson's claim based on the question itself – as opposed to the non-promotion to the position for which she was being interviewed – is barred by res judicata.

14

Certification Division of New York City's Civil Service Administration, did not state or suggest that candidates with lower examination scores were promoted ahead of Benson. Instead, Dobrowsky merely informed Benson that she was "tied with more than 100 candidates who achieved a final examination rating of 100." (Campos-Marquetti Decl. Ex. G at 1.) He went on to explain that when two or more candidates for a position have identical examination scores, they are listed on an "eligible list" in an order determined by the final five digits of their social security numbers and then considered for the position in the sequence in which they are listed. (Id.) The letter does not state Benson's list number, but it does note, "The number of the last eligible appointed was 99. . . . [T]his list terminated on January 12, 2004[.] . . . On that date, there were 307 eligibles left on this list." (Id. at 1-2.)

The only apparent basis for Benson's claim that less-qualified candidates were appointed ahead of her is the statement, "The number of the last eligible appointed was 99." Taken in context, however, it is clear that the "number" referred to is a list number, not an examination score. Because the only evidence cited by Benson supports the Board's position, there appears to be no basis in the record for a reasonable juror to believe that less-qualified candidates were selected for the position of Educational Analyst ahead of Benson.[5] This court therefore finds that Benson has failed to state a prima facie case of retaliation based on her non-promotion to the position of Educational Analyst.

---

[5] To the extent that identically qualified candidates were selected ahead of her, Benson offers no proof to satisfy the "causal connection" element of retaliation. The only evidence in the record strongly suggests that the Board filled the Educational Analyst position by following its standard, objective procedures. And if Benson is claiming that Seluga's question about her alleged assault of Gardener proves that her non-promotion was retaliatory, this court finds that the alleged assault would constitute a legitimate, nonretaliatory reason not to promote Benson, and that Benson has failed to show that this reason is pretextual.

### 3. Constructive Termination

Finally, Benson claims that she "was constructively terminated and became disabled from her employment at [the Board] because of the emotional distress that she was suffering from the retaliatory conduct of" the Board. (Pl.'s 56.1 St. ¶ 31.) In order for Benson to state a claim of constructive discharge, she must show "that her employer deliberately and discriminatorily created work conditions so intolerable that a reasonable person in [Benson's] position would have felt compelled to resign." Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 608 n.9 (2d Cir. 2006) (citation and quotations marks omitted).

I find no factual basis for Benson's allegation that the Board "deliberately" made her working conditions "intolerable." I consider first the question of deliberateness. Although Benson need not show that the Board had a specific intent to compel her resignation, "if [she] cannot show specific intent . . . she must at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective.'" Petrosino v. Bell Atlantic, 385 F.3d 210, 229-230 (2d. Cir. 2004). As discussed above, the Board had legitimate, nonretaliatory reasons for the non-time-barred acts Benson alleges, and Benson has not shown that those reasons were pretextual or even that the purpose of the acts – or one of several purposes, for that matter – was to effect Benson's discharge. Absent any evidence to the contrary, this court must conclude that the Board did not "deliberately" make Benson's working conditions intolerable.

This court also finds that the conditions effected by the Board's acts were not "intolerable." In the context of constructive discharge claims, "intolerable" means that a "reasonable person" in Benson's position "would have felt compelled to resign." Schiano, 445 F.3d at 608 n.9. "A constructive discharge generally cannot be established . . . simply through

evidence that an employee was dissatisfied with the nature of [her] assignments. . . . Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant." Stetson v. NYNEX Service Co., 995 F.2d 355, 360 (2d Cir. 1993) (citations and quotation marks omitted).

This court finds that Benson's non-time-barred allegations – that she was transferred to OSS and not promoted to the position of Educational Analyst – do not describe conditions that would compel a reasonable person to resign. The Second Circuit has explained that when, as here, an employee alleging constructive discharge has tolerated allegedly difficult working conditions for a number of years, the relevant question for a court is whether "deliberate employer actions" immediately preceding the discharge "ratcheted the harassment up to the breaking point for a reasonable person in [the plaintiff's] situation." Petrosino v. Bell Atlantic, 385 F.3d 210, 230 (2d Cir. 2004). In Petrosino, the Second Circuit found that the conduct at issue was not racheted up in the two-month period before the plaintiff was discharged. Id. It therefore held that there was no constructive discharge even though a reasonable juror could have found that the plaintiff had been subjected to a hostile work environment for eight years. Id.

As in Petrosino, there is no basis in this case to believe that the Board's conduct was "racheted up" in the period immediately preceding Benson's alleged constructive discharge. Benson alleges that she was constructively discharged on September 10, 2002. (Pl.'s 56.1 St. ¶ 31.) The acts that most closely preceded that date were Benson's non-promotion to the position of Educational Analyst, for which she was interviewed more than two years earlier (Benson Dep. Tr. at 49) and the OSS transfer, which occurred eleven months earlier (Pl.'s 56.1 Statement ¶ 9). Under Petrosino, in which the Second Circuit considered only the two months immediately

17

preceding discharge, this court finds that Benson cannot state a claim of constructive discharge.

### D. State Law Claims

Benson also claims that the Board's allegedly retaliatory actions violated New York Executive Law § 296(1)(e)(7). (Compl. ¶¶ 29-34.) "The district courts may decline to exercise supplemental jurisdiction over a claim [asserted pursuant to supplemental jurisdiction] if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). Having dismissed Benson's federal claims, this court declines to exercise jurisdiction over her state claims. Those claims are therefore dismissed without prejudice so that Benson may file them in state court.

### III. Conclusion

For the reasons set forth above, the Board's motion is GRANTED and Benson's claims under federal law are dismissed with prejudice. Her claims under state law are dismissed without prejudice to her refiling them in state court.


SO ORDERED.

Dated: September 29, 2006                           /s/ Nicholas G. Garaufis
       Brooklyn, N.Y.                               NICHOLAS G. GARAUFIS
                                                                     United States District Judge